# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

UNITED STATES OF AMERICA,        Case No. 5:24-CR-116

        Plaintiff,

        -vs-                JUDGE PAMELA A. BARKER

JAMES TYRONE HILL,

        Defendant.        MEMORANDUM OPINION & ORDER

This matter is before the Court upon Defendant James Tyrone Hill's ("Defendant" or "Hill") Motion to Suppress (Evidentiary Hearing Request) filed on May 21, 2024 ("Defendant's Motion"). (Doc. No. 17.)  On May 28, 2024, the United States of America filed a Response to Defendant's Motion ("the Government's Opposition").  (Doc. No. 20.)  On June 11, 2024, Defendant filed a Reply to the Government's Opposition ("Defendant's Reply").  (Doc. No. 22.)

As requested by Defendant, a hearing on Defendant's Motion was conducted on July 16, 2024. Defendant, through counsel, requested that certain documents, discussed more fully below, be produced after the hearing, and that the hearing be re-opened if/as necessary once the documents were produced to counsel.  The Court granted Defendant's request.  Also, at the conclusion of the hearing counsel for the Government requested time to file a supplemental brief once the documents were produced.  Counsel for Defendant did not object, and asked that he, too, be permitted to file a supplemental brief once the documents were produced.  The Court ordered counsel for the parties to file their respective supplemental briefs within seven (7) days of the production of the requested documents.

On July 29, 2024, the Government filed a Supplement to the Government's Opposition ("the Government's Supplement"), and Defendant filed a Supplemental Brief in Support of Defendant's Motion ("Defendant's Supplement").  (Doc. Nos. 35, 36.)  On August 5, 2024, Defendant filed a Reply to the Government's Supplement.  (Doc. No. 37.)  Defendant's Motion is now ripe for a decision.

### Background

On April 3, 2024, an indictment was filed charging Hill with Felon in Possession of Firearm and Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (Count 1) and Possession of a Firearm and Ammunition by a Person with a Domestic Violation Conviction, in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(8) (Count 2), based upon a search of Hill's residence that was conducted by the State of Ohio Adult Parole Authority ("APA") officers on October 27, 2022.  The details of that search were adduced at the July 16, 2024 hearing, during which the Government called two APA officers to testify:  Cody DeVault ("DeVault") and Dominic Paolucci ("Paolucci").

DeVault testified upon direct examination in relevant part as follows.  As an APA officer, DeVault was supervising Lionel Blair ("Blair") who was on post-release control, and his fellow APA officer, Parsons ("Parsons"), was supervising Hill, who was also on post-release control.  On the morning of October 27, 2022, DeVault received a call from Theonday Williams ("Williams") who advised him that Blair had spoken with her from jail by telephone about taking care of the victim in an ongoing criminal proceeding against Blair.  Williams told DeVault that Blair had told her to "[h]ave that guy James do it" or "[g]et a hold of that guy James to do it."[1]  Williams confirmed to DeVault that James's last name was Hill, and advised DeVault that Hill was being supervised by

---

[1] Transcript of July 16, 2024 Hearing (Doc. No. 30, PageID # 116.)

Parsons.  DeVault verified that Blair had an open case at that time and that there was a victim in that case, Zaria Jones.  DeVault also verified Williams's statement to him that Hill was on post-release control and was being supervised by Parsons.  Williams also advised DeVault that she had been romantically involved with both Hill and Blair at separate times.  From what DeVault remembered, Hill was on post-release control for violating a protection order and having weapons while under disability.

Based upon this information, DeVault staffed the case with his supervisor, Dawn Porter, Parsons, and Parsons's supervisor, Rick Polinori ("Polinori").  It was decided that that evening, they would visit Hill at his APA approved residence to speak with him to see if there was any kind of contact made either from Williams or Blair directly to him.  The APA already had a planned operation that evening with members of Canton's VICE or CRT team, as well as Stark County Metro Narcotics, to speak with individuals they had received complaints about regarding criminal behavior, or individuals who may have had violations of supervision that either needed to be addressed in the community or by placing them in custody and completing in-custody investigations into their alleged violations.[2]  So, Hill was added to the list of individuals to be visited.

That evening, APA officers arrived at Hill's APA approved address at 1019 4th Street NW, Canton, Ohio.  DeVault and Polinori knocked on Hill's door and he answered.  At Hill's request, he was allowed to put his dogs away before the APA officers made entrance to his home.  DeVault,

---

[2] In Defendant's Reply, Defendant asserts that the Government's representation set forth in the Government's Opposition, at Doc. No. 20, PageID # 77, that "[t]he only officers present were APA Officers" is contradicted by a report of TFO Jack Gardner, BATFE Task Force Officer, quoted by Defendant at Doc. No. 22, PageID # 85; and asserted that "the defense will provide witness testimony that the APA Officers were accompanied by other law enforcement."  (Doc. No. 22, PageID # 85.)  However, defense counsel did not develop or provide any such witness testimony at the hearing.  The testimony adduced at the hearing demonstrates that only APA officers were in Hill's approved residence at the time of the "home visit" and before Paolucci smelled and saw marijuana on the ledge of the safe, opened it and found marijuana and a bullet, which prompted the search of the residence and the location of the firearm.

Polinori and another APA officer, Mayle, made entrance to the residence and Polinori and DeVault spoke with Hill in the kitchen, outside the hearing of Hill's girlfriend who was in the living room. They asked Hill if anybody from Stark County jail had contacted him, or if there was anybody who had contacted him to commit some type of criminal activity.[3]

While DeVault and Polinori were speaking with Hill, Parole Officers Day and Paolucci came into the kitchen and ordered Hill to put his hands behind his back and Hill was placed in handcuffs. Upon further discussion with other parole officers there, they decided to conduct a security sweep of the residence to ensure that there was nobody else in the residence besides Hill and his girlfriend. According to DeVault, a security sweep is when officers go throughout a residence just making sure there are no other places where a person could be hiding.  The security sweep was conducted because at that point they had decided to conduct a parole search of the residence.  During the security sweep officers were able to secure the entire upstairs and then they began a parole search of the residence. During the parole search, the firearm that is the subject of the indictment was found.  At the time of the search, a supervisee with a medical marijuana card[4] was able to possess edibles and THC oils but was not permitted to smoke marijuana.

Upon cross-examination, DeVault confirmed that he had created a contact note in the APA's community supervision software system concerning what Williams had said to him during the call; and after the search was conducted, DeVault also had created a report.[5]  DeVault could not recall if

---

[3] Neither defense counsel nor counsel for the Government developed any testimony as to how Hill answered this question when it was posed to him, or that before Hill could answer he was placed in handcuffs.

[4] In Defendant's Motion, Defendant asserts that he had been granted permission from his APA supervising officer to use medical marijuana, but no evidence has been provided to support this assertion.  (Doc. No. 22, PageID # 86.)  And, with a medical marijuana card, the testimonies of DeVault and Paolucci demonstrated that that would only allow a parolee like Hill to possess edibles and THC oils.  This testimony was undisputed by Defendant.

[5] Upon learning that DeVault had created a contact note in "OCSS' about his conversation with Williams and had also prepared a report after the search was conducted, defense counsel requested, and the Court ordered, that the note and report be produced.  Defense counsel also requested that he be given the opportunity to reopen the hearing upon the

4

he had ever obtained a copy of the recorded jail phone call that Williams reported she had had with Blair, but upon re-direct, DeVault did confirm that he had listened to the call before the search, and had heard what he interpreted as Blair instructing Williams to get Hill to "finish the job" and pay him $17,000.  According to DeVault, he did ask Williams if she had spoken to Hill and she told him that she had not spoken to him after the recorded jail phone call.  DeVault confirmed that at the time the search of Hill's approved residence was conducted, he had no information that Hill was ever aware of the phone call between Blair and Williams.

Paolucci testified in relevant part as follows.  On October 27, 2022, Paolucci went to the approved residence of Hill to assist with the home visit.  He could not remember if his body camera was turned on that night, but after conducting a search to determine if video from his body camera existed, he could not find one.  Paolucci was with two other APA officers that entered the residence after DeVault, Mayle and Polinori had entered it.  Paolucci had been made aware of the reason for the home visit, i.e., a possible hit for hire that the offender (Hill) was involved in.  According to Paolucci, a home visit was necessitated or required due to the allegations of possession of a firearm, and threats that had been relayed to them.

When shown a portion of Mayle's body camera video, marked as Government's Exhibit 1, Paolucci confirmed that it showed him outside of the residence door, entering the living room and then looking around for contraband.  Paolucci testified that he noticed a red safe on the TV stand under the TV.  When shown Government's Exhibit 2, also a portion of Mayle's body camera video, Paolucci testified that he can be seen at the right side of the video with the flashlight and black hat,

---

production of the note and report and the Court granted that request.  However, after the note and report were produced to defense counsel, and as of the date of the filing of supplemental briefs on July 29, 2924 no request for the reopening of the hearing was made by defense counsel.

and moving closer to the red safe where, as he got closer to it, he smelled marijuana.  Paolucci testified that he saw that the safe was cracked and that marijuana with residue was spilling from the bottom layer of the red safe over onto the TV stand.  Paolucci, too, testified that a parolee like Hill is not permitted to smoke marijuana even if he had a medical marijuana card.  So, Paolucci opened the safe, and saw marijuana and ammunition or a bullet in the bottom of the safe.  Upon finding the marijuana and the bullet in the red safe, Paolucci alerted the other officers in that room regarding what he had found, and he began putting gloves on.  Then, Officer Day advised that Hill was to be placed under arrest or detained in handcuffs.

Upon cross-examination, Paolucci testified that he did not know why Mayle had turned her body camera off between the first clip and second clip shown to him, but stated that Mayle did it again during the search.  It was during the time between Mayle turning off and then on again, her body camera, that Paolucci approached the safe and opened it.  Upon re-direct examination, Paolucci testified that when Mayle turned off her body camera, there was no safety risk and no searching; Mayle was just standing and observing from her perspective.  When shown Defense Exhibit A (the complete body cam clip that the Government had marked as Government's Exhibit 1), Paolucci recognized the safe in the lower left corner of the image, but he could not tell for sure from the image whether it appeared to be completely closed.  Paolucci had reviewed videos to see whether any of them showed that the safe was cracked as he testified, but he did not find any that showed either that it was cracked open, as he testified, or closed.  Paolucci's testimony was that the safe was "cracked", not closed and that marijuana was spilling out from it.  He described what he saw as there being a ledge for the safe door, and he could see the marijuana on the safe door ledge or part of the safe door and the table or where the safe was sitting.  Paolucci testified that photos were taken of the safe but were deleted because they were not used in the APA violation hearing.  To the best of his knowledge,

6

the marijuana and bullet found in the safe were not seized.  A screenshot of the image shown to Paolucci was marked as Defendant's Exhibit E.

As a parolee with the Adult Parole Authority, Hill was subject to Conditions of Supervision that included obeying federal, state and local laws and ordinances; not purchasing, possessing, owning, using or having under his control, any firearms or ammunition and obtaining written permission from the APA prior to residing in a residence where these items are securely located; and agreeing to the warrantless search of his place of residence by his supervising officer or other authorized personnel of the Ohio Department of Rehabilitation and Correction at any time.  (Doc. No. 20-1, PageID # 79-80.)

Defendant argues that the parole search of Hill's approved residence on October 27, 2022 was conducted without reasonable cause in violation of Hill's constitutional rights as limited by his status as a parolee under O.R.C. § 2967.131(C); and because the officers lacked reasonable cause to believe that evidence of a violation of Hill's parole would be found in his residence, the firearm and ammunition seized as a result of the parole search should be suppressed.  The Government argues that what began as a "home visit" turned into a search subject to the "reasonable suspicion" standard, and that officers had a "reasonable suspicion" to search Hill's residence, and therefore, the firearm and ammunition should not be suppressed.

**<u>Analysis</u>**

According to the Sixth Circuit, "[a] warrantless search of an individual under criminal supervision, including a parolee, is reasonable under the Fourth Amendment if it satisfies either of "two distinct doctrinal frameworks." *United States v. Herndon*, 501 F.3d 683, 687-688 (6th Cir. 2007).  The Government only needs to satisfy one.  *United States v. Dunbar*, 2022 WL 17245098 at *3 (6th Cir. Nov. 28, 2022).  The first framework is the "special needs" test set forth in *Griffin v.*

*Wisconsin*, 483 U.S. 868, 880 (1987), i.e., a parolee search is reasonable if it is conducted in accordance with a constitutional state law authorizing warrantless searches.  *United States v. Sharp,* 40 F.4th 749, 752-53 (6th Cir. 2022).  And, under Ohio Rev. Code § 2967.131(C), a parole officer may search a parolee without a warrant if he has "reasonable grounds" to suspect that the parolee has violated the law or a parole condition.  *Dunbar,* 2022 WL 17245098 at *4.  According to the Sixth Circuit, this Ohio statute "passes constitutional muster."  *Sharp*, 40 F.4th at 753, *Dunbar,* 2022 WL 17245098 at *4 (citing *United States v. Loney*, 331 F.3d 516, 521 (6th Cir. 2003)).

The second test is the "totality of the circumstances" test and the relevant factors to consider include a person's position on the "continuum" of criminal punishments, the terms of the search condition communicated to the person, and the State's interest in supervision.  *Sharp*, 40 F.4th at 753, citing *Samson v. California*, 547 U.S. 843, 848, 850-854 (2006) and *United States v. Knights*, 534 U.S. 112, 118 (2001) (referred to as "the *Knights-Samson* approach," *see Dunbar*, 2022 WL 17245098 at *3)).  "Relevant factors under the *Knights-Samson* approach include the suspect's post-supervision status, terms of the search condition, and the State's interest in post-release supervision."  *Id.* at *4 (citing *Sharp*, 40 F.4th at 753).

Defendant frames the question for determination by this Court as whether the officers' search of Hill's residence "was supported by reasonable suspicion of involvement in a purported murder for hire as alleged in Ms. Williams' statement to Parole Officer DeVault."  (Doc. No. 17, PageID # 55.)  Defendant cites *United States v. Payne*, 181 F.3d 781, 788 (6th Cir. 1999) (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)) for the proposition that "[r]easonable suspicion is based on the totality of the circumstances and has been defined as requiring "articulable reasons" and "a particularized and objective basis for suspecting the particular person."  (Doc. No. 37, PageID # 182.)

Hill argues that the evidence adduced at the hearing showed that there were no "articulable reasons" providing a "particularized and objective basis" to believe that Hill was involved in criminal conduct.

According to Hill, there was a complete lack of any evidence even suggesting involvement by him in the commission of a crime and therefore, the search was not supported by reasonable suspicion. (*Id.*)  Hill takes issue with the Government's position that based upon information received from Williams concerning the murder for hire plot, officers went to Hill's residence to conduct a "home visit" and inquire of Hill regarding the allegations made by Williams, but what occurred during the home visit when officers were speaking with Hill, i.e., the location of marijuana and a bullet together with the allegations of his involvement in a murder for hire plot, provided officers with reasonable suspicion to search Hill's residence.

! Hill's status as a parolee "severely diminished" his expectations of privacy.  *See Sharp*, 40 F.4th at 753 (quoting *Samson*, 547 U.S at 852).  Ohio has a significant interest in supervising parolees like Hill.  *Sharp*, 40 F.4th at 753.  And Hill agreed to the condition of the warrantless search of his place of residence by the APA.[6]  Defendant is correct that "[r]easonable suspicion exists if, based on the totality of the circumstances, the officer's suspicion has 'a particularized and objective basis.'" *Id.* (citing and quoting from *United States v Cortez*, 449 U.S. 411, 417 (1981)).  According to the Sixth Circuit, "[t]his standard is 'considerably' lower than 'a preponderance of the evidence,' and is 'obviously less demanding' than probable cause."  *Sharp*, 40 F.4th at 753 (citing and quoting from *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

---

[6] The condition reads that the warrantless search can take place "at any time" but it makes no mention of the statutory "reasonable grounds" standard for parolee searches, Ohio Rev. Code § 2967.131(C).  *See Sharp*, 40 F.4th at 761,  fn 1. And it does not read that it can take place "at any time" "with or without cause" as was the case in *Samson*.  *Id*. at 754 (citing *Samson*, 547 U.S. at 846).

The Court finds that based on the totality of circumstances, the APA officers' suspicion had a "particularized and objective basis" to conduct the search of Hill's residence when, during the home visit to inquire regarding Williams' representations that Blair had asked her to hire Hill to commit a murder of the victim in Blair's pending case, Paolucci saw marijuana in plain view on the ledge of a safe that was cracked open and upon opening the safe saw more marijuana and a bullet, the existence of which violated the conditions of his parole. *See Dunbar*, 2022 WL 17245098 at *4 (finding that drug paraphernalia, in plain view, separately provided reason to believe that the defendant broke the law).

In effect, Defendant has argued that Williams' representations were not reliable and despite their unreliability and pointing to portions of the testimonies of DeVault and Paolucci,[7] APA officers – along with other law enforcement officers - went to Hill's residence, not with the intention of conducting a "home visit" but with the intention of searching his residence without reasonable suspicion. But Williams did provide DeVault with "James's" last name and knew that Parsons was supervising Hill. She admitted that she had been in romantic relationships with both Hill and Blair which provides some indication that when Blair asked Williams to engage Hill to complete the murder for hire, he knew of Williams's relationship with Hill. DeVault confirmed that there was a

---

[7] Defendant cites to DeVault's testimony that Hill was added to their list of "problematic" parolees who the APA officers were going to contact on that date for what Defendant describes as a "group [of] alleged non-compliance parolees", arguing that this "belies the intent to merely ask Mr. Hill about the murder-for-hire verbal request from Lionel Blair to Ms. Williams." (Doc. No. 36, PageID #s 177-78.) Defendant then cites to Paolucci's testimony that he interprets as placing Hill on the list to contact the evening of October 27, 2022 "for an alleged firearm possession and threats." Defendant argues that what he asserts is the "inconsistency [of testimony by DeVault and Paolucci] of the purpose of approaching Mr. Hill's APA approved residence…it is not credible that the officers merely intended to question James Hill regarding the murder-for-hire jail conversation." However, the Court does not construe DeVault's and Paolucci's testimonies as being inconsistent or supporting Defendant's argument that they went to Hill's residence with the intent to conduct a parolee search. In fact, DeVault also testified that he, like Paolucci, was aware that Hill was on post-release control for violating a protection order and having weapons while under disability. And, both DeVault and Paolucci testified that they went to Hill's residence to conduct a "home visit".

victim in Blair's pending case and listened to the jail call between Williams and Blair, which confirmed what Williams had reported to him.[8]  And DeVault and Paolucci knew that Hill had prior convictions involving violence and firearms.  So, and based upon their testimony, they did go to Hill's approved residence for a "home visit" to discuss the allegations with him, and there is no evidence that Hill objected to the APA officers entering his home to speak with him.  In other words, the "home visit" gave the APA officers the opportunity to do just what Defendant argues they should have done – advise Hill of, and investigate the allegations made by, Williams.

Defendant also questions the credibility of Paolucci.  According to Defendant, the video evidence/images demonstrate that the red safe was closed and does not show any marijuana or residue "spilling" out from it.  The Court reviewed the video evidence/images introduced at the hearing and cannot discern from them whether the safe was cracked open, as Paolucci testified, or closed, as Defendant argues.  Thus, the Court is left with the testimony of Paolucci and the Court finds his testimony credible.  Defendant's reliance on the fact that Mayle turned her body camera on and off is of no moment because Paolucci testified that he did not know why she did that, she did it later during the search, and there were no safety concerns at the time that Mayle did so.  Defendant argues that because the bullet and marijuana in the safe were not seized and were not photographed, there is no inventory or other documentation of the conditions at the time of the search, and Paolucci did not activate his body camera during the search so "no value can be placed upon the testimony provided concerning the discovery [of the marijuana and bullet] without any proof of either of those objects."  (Doc. No. 36, PageID # 180.)  The Court disagrees.  Again, as the trier of fact charged with evaluating the credibility of witnesses, to include Paolucci, the Court finds that his testimony that he was looking

---

11

around Hill's living room, smelled marijuana as he approached and saw the red safe, with marijuana residue on the ledge of the cracked-open safe – all in plain view – is sufficient to demonstrate that Hill was in violation of his conditions of parole, that along with the information that prompted the "home visit" – the allegation of a murder-for-hire plot – constituted reasonable suspicion to conduct a search of Hill's residence.

Accordingly, Defendant's Motion is denied.


**IT IS SO ORDERED.**


 s/Pamela A. Barker

PAMELA A. BARKER

Date:  August 28, 2024                U. S. DISTRICT JUDGE